Elizabeth Melius Trust, Louis W. Abrons, Trustee, et al., [1] v. Commissioner. Melius Trust v. Commissioner
Docket Nos. 107168, 107170, 107171, 107177, 107178, 107179, 107197.
United States Tax Court
1943 Tax Ct. Memo LEXIS 408; 1 T.C.M. (CCH) 730; T.C.M. (RIA) 43134; March 10, 1943
*408 1. Held, the capital stock of Lexave Syndicate, Inc. became worthless in 1937; held, further, petitioners properly ascertained that certain loans made to Lexave Syndicate, Inc. and certain participation certificates in the third mortgage of Lexave Syndicate, Inc. also became worthless in 1937. 2. Petitioners (except one) prior to July, 1931, had loaned money to Lexington Central Corporation. In July, 1931, Lexington Central sold certain property to Lexave Syndicate, Inc. and received in part payment a third purchase money mortgage which ran for five years without interest. Lexington Central caused participation certificates therein to be issued to petitioners in part payment for the money they had loaned to Lexington Central, dollar for dollar. Held, the statutory basis to petitioners of their participation certificates in the third mortgage is the cost thereof; held, further, the cost of the participation certificates is the fair market value of the property given in exchange for them; held, further, in the absence of other evidence, such fair market value was equal to the fair market value of the participation certificates; held, further, the fair market value of the participation *409 certificates was their par, discounted so as to allow for interest at the legal rate. Lionel S. Popkin, Esq., Mortimer H. Hess, Esq., 20 Pine St., New York City, and Herbert L. Abrons, Esq., for the petitioners. John W. Fisher, Esq., and Thomas R. Charshee, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion These consolidated proceedings are for redetermination of deficiencies in income taxes determined by the respondent against petitioners for the calendar years 1937 and 1938 in amounts as follows: Petitioner
Docket No.
1937
1938
Elizabeth Melius Trust, et al
107168
$ 512.75
None
Hyman Schroeder
107170
1,184.04
$ 1,396.37
Gretchen Melius Herrlich Trust, et al
107171
512.75
None
Samuel M. Fox
107177
738.48
398.50
Louis W. Abrons
107178
7,083.39
7,686.55
Anne S. Abrons
107179
33,631.21
10,446.27
Jacob and Sadie Schroeder
107197
1,304.72
1,726.91
In the statements attached to the respective deficiency notices for 1937, the respondent in adjusting petitioners' net income (or loss) as reported on their income tax returns advised petitioners of the disallowance of certain deductions taken by petitioners for (1) loss on investment *410 in capital stock of Lexave Syndicate, Inc., (2) payments under guarantees to first and second mortgagees of properties of Lexave Syndicate, Inc., and (3) worthlessness of participations in the third mortgage on properties of Lexave Syndicate, Inc., as follows: Petitioner
(1)
(2)
(3)
Total
Elizabeth Melius Trust
$ 1,750.00
$ 3,950.00
$ 14,187.50
$ 19,887.50
Hyman Schroeder
3,675.00
8,721.00
34,050.00
46,446.00
Gretchen M. H. Trust
1,750.00
3,950.00
14,187.50
19,887.50
Samuel M. Fox [2]
875.00
1,875.00
2,837.50
5,587.50
Louis W. Abrons
17,500.00
41,100.00
58,600.00
Anne S. Abrons
184,437.50
184,437.50
Jacob and Sadie Schroeder
2,450.00
5,814.00
22,700.00
30,964.00
Petitioners by appropriate assignments of error contest all of these adjustments. In the two trust proceedings these were the only adjustments made by the respondent. In the proceedings *411 of the other five petitioners the respondent made other adjustments which are not contested. In the statements attached to the respective deficiency notices for 1938 (no deficiencies were determined against the two trusts for 1938), the respondent in adjusting petitioners' net income (or loss) as reported on their income tax returns advised petitioners of the disallowance of certain deductions taken by petitioners for (1) loss on investment in capital stock of Lexave Syndicate, Inc., (2) payments under guarantees to the first and second mortgagees of properties of Lexave Syndicate, Inc., for the account of Lexave Syndicate, Inc., and (3) worthlessness of participations in the third mortgage on properties of Lexave Syndicate, as follows: Petitioner
(1)
(2)
(3)
Total
Hyman Schroeder
$1,837.50
$ 4,360.50
$ 34,050.00
$ 40,248.00
Samuel M. Fox [3]
437.50
1,875.00
2,837.50
5,150.00
Louis W. Abrons
8,750.00
41,100.00
49,850.00
Anne S. Abrons
184,437.50
184,437.50
Jacob and Sadie Schroeder
1,225.00
2,907.00
22,700.00
26,832.00
*412 Petitioners by appropriate assignments of error contest all of these adjustments. In the case of each of the five petitioners against whom deficiencies were determined for 1938 the respondent also made other adjustments which are not contested. The contested adjustments for 1938 represent a duplication in certain instances of 50 percent and in the other instances of 100 percent of the respective amounts claimed for 1937 as follows: Petitioner
(1)
(2)
(3)
Total
Hyman Schroeder
50%
50%
100%
$ 40,248.00
Samuel M. Fox
50%
100%
100%
5,150.00
Louis W. Abrons
50%
100%
49,850.00
Anne S. Abrons
100%
184,437.50
Jacob and Sadie Schroeder
50%
50%
100%
26,832.00
Findings of Fact Petitioners in Docket Nos. 107168 and 107171 are fiduciaries whose addresses are c/o L. A. Friedman, Jr., 11 W. 42nd St., New York City, New York. The respective income tax returns for the calendar year 1937 were filed with the collector of internal revenue for the third district of New York. Petitioners Hyman Schroeder, Samuel M. Fox, Louis W. Abrons, Anne S. Abrons, and Jacob and Sadie Schroeder are individuals and filed their respective income tax returns for the calendar *413 years 1937 and 1938 with the collector for the third district of New York. Each of the aforesaid returns above mentioned was filed on a cash basis and the losses claimed in these proceedings were not compensated for by insurance or otherwise. Lexington Central Corporation, sometimes referred to herein as "Lexington Central" was organized as a corporation under the laws of the State of New York in the year 1928. During the period from 1928 until July 2, 1931, Lexington Central acquired certain real estate sometimes referred to herein as the "Lexave property" in the City of New York on the east side of Lexington Avenue between East 46th and East 47th Streets. The Lexave property comprised a plot of approximately 36,961 square feet and the improvements thereon consisted of various 3, 4, 5 and 6-story old tenement brick buildings. Included in this plot is a parcel sometimes referred to herein as the "leasehold parcel", known as 493 Lexington Avenue. The leasehold parcel was a strip of 20 feet by 85 feet with the 20 feet fronting on Lexington Avenue at a distance of 20.5 feet south of the corner of Lexington Avenue and East 47th Street. Title to this leasehold parcel was not acquired *414 as Lexington Central had only a lease thereon which gave it an option to purchase the leasehold parcel as hereinafter set forth. Petitioner (except Anne S. Abrons) and others on or about June 26, 1931, entered into a Syndicate agreement, whereby a Syndicate was formed, and one Joseph Milner and one Alfred L. Rose were designated and appointed as Syndicate Managers and whereunder it was provided that a New York corporation should be formed to acquire the Lexave property. Pursuant to the Syndicate agreement, Lexave Syndicate, Inc., a corporation, was organized under the laws of the State of New York in the year 1931. Lexave Syndicate, Inc. issued its entire authorized capital stock, consisting of 100 shares for the sum of $175,000, which was paid in cash by the Syndicate members to the Syndicate Managers who in turn paid said sum to Lexave Syndicate, Inc. All but three qualifying shares were issued to and held by Milner and Rose as Syndicate Managers for the benefit of the Syndicate members and the Syndicate as a whole. In July, 1931, petitioners named below paid their respective portions of the $175,000 for stock of Lexave Syndicate, Inc. acquiring of the total stock issue of Lexave *415 Syndicate, Inc. the percentages set opposite their respective names, as follows: Amount
Percentage
paid for
of Entire
stock of
Stock Issue
Lexave
Acquired
Syndicate,
by each
Petitioner
Inc.
Petitioner
Elizabeth Melius Trust
$ 1,750
1.0%
Hyman Schroeder
3,675
2.1%
Gretchen M. H. Trust
1,750
1.0%
Samuel M. Fox
875
0.5%
Louis W. Abrons
17,500
10.0%
Jacob Schroeder
2,450
1.4%
The Syndicate agreement of June 26, 1931, required all of the members to make original subscriptions proportionately, in the total amount of $175,000. This amount was subscribed and paid over to Lexave Syndicate, Inc. in return for the latter's capital stock, as hereinabove set forth. It was provided in the agreement that $150,000 of the sum paid to the managers should be applied to the purchase price of the Lexave property and the balance was intended to cover necessary fees, organization expenses, interest, taxes, etc. It was understood in the beginning that the surplus of $25,000 over the purchase price would not go far toward covering carrying charges. It was provided in the Syndicate agreement that $240,000 would be assessed against the Syndicate members to carry *416 the property for the next ensuing two years. In paragraph Fourth of the Syndicate agreement each Syndicate member severally agreed with the other members to pay his proportionate share of assessments made by the managers for carrying charges. On July 2, 1931, Lexington Central sold and conveyed the Lexave property (exclusive of the aforesaid leasehold parcel, the lease of which was assigned to Lexave Syndicate, Inc.) to Lexave Syndicate, Inc. for the purchase price of $3,492,500, $150,000 of which was paid in cash by Lexave Syndicate, Inc. to Lexington Central and the title to the said Lexave property was taken subject to two mortgages and the Lexave Syndicate, Inc. gave a third purchase money mortgage, the purchase price being made up as follows: Cash
$ 150,000
First mortgage
2,400,000
Second mortgage
375,000
Third mortgage
567,500
Upon the formation of the Syndicate in June, 1931, it was estimated and expected by the Syndicate members that the Lexave property would be operated at a loss of approximately $120,000 per annum for five years. Seventeen individuals and corporations signed and executed the Syndicate agreement and became members of the Syndicate. Some of *417 the seventeen Syndicate members were interested in the Lexave property prior to its purchase by Lexave Syndicate, Inc. The Syndicate members who were interested in the Lexave property prior to its purchase by Lexave Syndicate, Inc. together acquired a 35 percent interest in the Syndicate. The remaining 65 percent interest in the Syndicate was acquired by persons who prior to the purchase of the Lexave property by Lexave Syndicate, Inc. had no interest in said property. The persons who acquired a 65 percent interest in the Syndicate subscribed for 65 percent of the capital stock of Lexave Syndicate, Inc., paid in cash 65 percent of $175,000 therefor, deposited 65 percent of $240,000, being their share of the estimated operating deficit for the first two years beginning July 1, 1931, and signed and delivered to the Bowery Savings Bank, the first mortgagee, and Julius Tishman & Sons, Inc., the second mortgagee, guarantee agreements whereunder they guaranteed payment of the real estate taxes on the Lexave property and interest on the first and second mortgages and other liens or charges upon the premises for the period of five years from July 1, 1931. Among the persons who purchased *418 a 65 percent interest in the Lexave property upon the formation of the Syndicate in June, 1931, were the following individuals, some of whom were prominent in the real estate and banking fields in the City of New York and experienced in and familiar with real estate in the City of New York: Paul Rosenthal, director of United States Realty Company; Robert E. Simon, a real estate operator, who owned Carnegie Hall; Monroe Gutman, a partner of Lehman Brothers; Samuel D. Leidesdorf, owner of the Pershing Square Building; and Rex Cole. The persons who, prior to the formation of the Syndicate in June, 1931, were interested in Lexington Central subscribed for the remaining 35 percent of the capital stock of Lexave Syndicate, Inc., paid in cash 35 percent of $175,000 therefor, deposited 35 percent of the $240,000, being their share of the estimated operating deficit for the first two years beginning July 1, 1931, and signed and delivered to the Bowery Savings Bank, and Julius Tishman & Sons, Inc., guarantee agreements whereunder they guaranteed payment of the real estate taxes on the Lexave property and interest on the first and second mortgages and other liens or charges upon the premises *419 for the period of five years from July 1, 1931. Among the persons who purchased a 35 percent interest in the Lexave Syndicate were the following individuals, prominent in the real estate and banking fields in the City of New York, and experienced in and familiar with real estate in the City of New York; Herbert H. Lehman, a partner of Lehman Brothers; Louis W. Abrons, for many years president and director of General Realty and Utilities Company; Hyman Schroeder, a director of General Realty and Utilities Company; and Joseph Milner, a real estate operator and builder in the City of New York. The syndicate acquired the Lexave property on the assumption that it would be a "long pull" proposition. One of the Syndicate members put up his share of the estimated five-year deficit at the time of the formation of the Syndicate. It was the intention of the Syndicate members to acquire only the Lexave property. The Lexave property was in the midst of large office and hotel buildings, including the Lincoln Building, Chanin Building, Hotel Commodore, Chrysler Building, Grand Central Building, Daily News Building, Grand Central Palace, Waldorf Astoria, General Electric Building, Tudor City, *420 Commerce Building and Radio City. Bowery Savings Bank loaned the sum of $2,400,000 and took as security the above-mentioned first mortgage on the Lexave property. The first mortgage acquired by the Bowery Savings Bank provided for interest at 5 percent per annum, was for a period of five years and required no amortization of principal. By its terms the mortgage was to mature on July 1, 1936. The second mortgage on the Lexave property acquired by Julius Tishman & Sons, Inc., provided for interest at 6 percent per annum and likewise was for a period of five years and required no amortization of principal. By its terms it was to mature on July 1, 1936. The third mortgage in the amount of $567,500 was also for a period of five years, maturing on July 1, 1936, and requiring no amortization or interest. On April 9, 1931, shortly prior to the time when the Bowery Savings Bank loaned the sum of $2,400,000 on the first mortgage on the Lexave property, the Lexave property, excluding the leasehold parcel, was appraised at $4,000,000 by Horace S. Ely & Company, a competent and qualified real estate appraiser in the City of New York. In making this loan the Bowery Savings Bank accepted and *421 relied upon this appraisal. In the City of New York in 1931 it was the practice of savings banks to lend on first mortgages only 60 percent of the value of the mortgaged real estate. On June 26, 1931, petitioners and the remaining parties to the Syndicate agreement made and delivered to the Bowery Savings Bank an agreement whereby each of the Syndicate members agreed, among other things, as follows: the Syndicate members each and severally, and to the extent of such percentage as their original subscriptions to the Syndicate bore to the entire amount originally subscribed, guaranteed to be severally liable for such proportionate amount of taxes, assessments, water rates, water rents or other liens and charges upon the Lexave property which might be a lien thereon in priority to the first mortgage and of all installments of interest upon the first mortgage which should become due and payable during the period of the mortgage. A similar separate agreement was executed June 26, 1931, by and between all the Syndicate members and Julius Tishman & Sons, Inc. The third mortgage did not provide for interest to be paid thereon for the five-year period ending July 1, 1936, for the reason *422 that the persons who first became interested in the Lexave property on the formation of the Syndicate in June, 1931, and acquired a 65 percent interest in the Syndicate so stipulated as a condition to their becoming members of the Syndicate. Lexington Central, as the seller of the Lexave property, was entitled to receive the purchase money third mortgage. It caused the third mortgage to be transferred to The New York Trust Company, as trustee, and simultaneously The New York Trust Company made, executed and delivered its indenture which recites the acquisition by the petitioners, Elizabeth Melius Trust, Hyman Schroeder, Gretchen Melius Herrlich Trust, Samuel M. Fox, Anne S. Abrons and Jacob Schroeder and certain other individuals, of participations in the third mortgage in the proportions stipulated in the indenture. In July, 1931, the petitioners named below acquired participation certificates, sometimes hereinafter referred to as participations, in the above-mentioned third mortgage, which was made and executed by Lexave Syndicate, Inc. on the Lexave property in exchange for certificates of indebtedness made and issued by Lexington Central to petitioners, respectively, the amount *423 of the respective participations which the said petitioners acquired being as follows: Petitioner
Participations
Elizabeth Melius Trust
$ 14,187.50
Hyman Schroeder
34,050.00
Gretchen Melius Herrlich Trust
14,187.50
Samuel M. Fox
2,837.50
Anne S. Abrons
184,437.50
Jacob Schroeder
22,700.00
When petitioners (except Louis W. Abrons) acquired participations in the third mortgage, as above set forth, Lexington Central was indebted to each of them respectively in an amount in excess of the face amount of the participations. Each of the petitioners (except Louis W. Abrons) between the time when Lexington Central was organized in 1928 and July, 1931, from time to time loaned sums of money to Lexington Central, which issued to these petitioners certificates of indebtedness reciting the amounts owing by Lexington Central to these petitioners. The amounts so loaned by these petitioners to Lexington Central (being the amounts owing by Lexington Central to the respective petitioners on July 1, 1931) were as follows: Amounts
Petitioner
Loaned
Elizabeth Melius Trust
$ 32,500
Hyman Schroeder
78,000
Gretchen Melius Herrlich Trust
32,500
Samuel M. Fox
6,500
Anne S. Abrons
422,500
Jacob Schroeder
52,000
*424 The aforesaid participations in the third mortgages were received and accepted by the respective petitioners in partial satisfaction of the respective indebtednesses owing to them by Lexington Central pro tanto dollar for dollar in the face amount of the respective participations in the third mortgage which they received, and the aforesaid certificates of indebtedness issued by Lexington Central were reduced in amount to that extent. The cost basis of petitioners for their respective participations in the third mortgage on the Lexave property is as follows: Elizabeth Melius Trust
$ 10,601.73
Hyman Schroeder
25,444.14
Gretchen Melius Herrlich Trust
10,601.73
Samuel M. Fox
2,120.35
Anne S. Abrons
137,822.43
Jacob Schroeder
16,962.76
During each of the calendar years 1931, 1932, 1933, 1934, 1935, 1936 and 1937, the Lexave property was operated at a loss. Between July 1, 1931, and May 8, 1936, petitioners named below paid to Lexave Syndicate, Inc., in the years indicated below, for the purposes of enabling Lexave Syndicate, Inc. to meet carrying charges, interest and other expenses, amounts as follows: Elizabeth
Hyman
Gretchen
Samuel
Louis W
Jacob
Year
Melius Trust
Schroeder
M. H. Trust M. Fox
Abrons
Schroeder
1931
$2,400
$5,040
$2,400
$1,200
$24,000
$3,360
1933
600
1,260
600
100
6,000
840
1934
1,701
575
6,500
1,134
1935
300
3,000
200
1936
950
420
950
1,600
280
$3,950
$8,721
$3,950
$1,875
$41,100
$5,814
*425 The above petitioners had a right to demand repayment with interest at 6 percent from Lexave Syndicate, Inc. of the above payments made for carrying charges, under the terms of the Lexave Syndicate agreement. Stock of the Lexave Syndicate, Inc. was non-assessable. Milner and Rose, the Syndicate Managers, were not personally liable or responsible for any of said payments. All of the Syndicate members together loaned in the aggregate to Lexave Syndicate, Inc. the sum of $372,890 during the perior from July 1, 1931, to July 1, 1936. After acquiring the Lexave property in July, 1931, Lexave Syndicate, Inc. managed and operated said property and continued so to do until the late summer of the year 1937 when the property was abandoned. In each year from July 1, 1931, until July 1, 1936, Lexave Syndicate, Inc. paid all real estate taxes on the Lexave property. During the years 1932, 1933, 1934, 1935, 1936 and 1937 Lexave Syndicate, Inc. paid all corporation franchise taxes which became due to the State of New York. From the time when Lexave Syndicate, Inc. acquired the Lexave property on July 1, 1931, until August, 1937, petitioners and the other Syndicate members had confidence in *426 the property and believed that it would be ultimately sold at a substantial profit and at a price substantially in excess of the first, second and third mortgages, the loans and stock investment. On or about July 2, 1931, Lexave Syndicate, Inc. acquired by assignment the lease on the above-mentioned leasehold parcel, which lease provided for an annual rental of $10,000 per year until April 1, 1932, and an annual rental of $14,000 thereafter. The lessee had the option of purchasing the leasehold parcel for $300,000. Lexave Syndicate, Inc. surrendered this lease and assigned it to the lessor on May 23, 1932, and thereby gave up its option to purchase the leasehold property. On May 23, 1932, when Lexave Syndicate, Inc. surrendered the above-mentioned lease, the Syndicate members were of the opinion and entertained the reasonable belief that they would be able to purchase the leasehold parcel at a reasonable price, if they should desire so to do at a later time. Petitioners and the other Syndicate members at the time Lexave Syndicate, Inc. surrendered the above-mentioned lease reasonably believed that if they should wish to purchase the leasehold parcel and not be able so to do, they *427 could, if they desired, construct a building on the Lexave property around the leasehold parcel. A building could advantageously have been constructed on the Lexave property without using the leasehold parcel. During the latter half of 1932 the Syndicate Managers, at the request of the Syndicate members, endeavored to obtain a reduction in the first mortgage interest rate and in October, 1932, a reduction was obtained from 5 percent to 4 percent per annum. At that time, $12,000 due as interest was unpaid, and as a condition to obtaining the reduction in interest rate as aforesaid, the sum of $12,000 was paid at the end of 1932. On July 1, 1934, the interest rate on this mortgage was again reduced from 4 percent to 2 percent. In 1932 a moratorium law was passed in the State of New York and the members of the Syndicate were advised in 1932 by their attorneys that under the provisions of the moratorium law the Syndicate members were relieved of their obligations under the guarantees made and delivered by the Syndicate members to the Bowery Savings Bank and to Julius Tishman & Sons, Inc. During the latter part of 1932 petitioners were informed that the United States Government was *428 in the market for a post office site in the vicinity of the Grand Central Terminal in New York City and that negotiations were being carried on between the United States Government and certain third persons for a post office site located at the southwest corner of Lexington Avenue and East 45th Street, one block from the Lexave property. During the latter part of 1932 petitioners and the Syndicate Managers took steps to present to the United States Post Office Department the merits of the Lexave property for a post office site, and from the end of 1932 until and including the month of May, 1937, petitioners, the Syndicate Managers, Lexave Syndicate, Inc. and an attorney and a real estate broker employed by Lexave Syndicate, Inc. were engaged continuously in an effort to induce the United States Government not to purchase the site at the southwest corner of Lexington Avenue and East 45th Street and to induce the United States Government to purchase the Lexave property. Petitioners, the Syndicate Manager, Lexave Syndicate, Inc. and the attorney and real estate broker engaged by them, devoted a large amount of time and expended sums of money during each of the years 1933, 1934, 1935, *429 1936 and 1937 in their efforts to sell the Lexave property to the United States Government for a post office site. Between February, 1933, and June, 1937, Lexave Syndicate, Inc. expended the sum of $6,902.06 for cash disbursements for traveling expenses of the Syndicate Managers and the persons employed by Lexave Syndicate, Inc. and for printing expenses, photostats and documents, all in connection with the efforts of Lexave Syndicate, Inc. to sell the Lexave property to the United States Government. From 1933 until August, 1937, petitioners reasonably believed that Lexave Syndicate, Inc. might be able to sell the Lexave property to the United States Government for the sum of $4,250,000. In 1933, Joseph Milner, one of the Syndicate Managers, made a trip to Chicago, Illinois, for the purpose of presenting the merits of the Lexave property for a merchandise mart. In 1934 Lexave Syndicate, Inc. carried on negotiations for the sale of the Lexave property for the construction of an exhibition building for South American products. In the latter part of 1936 Lexave Syndicate, Inc. negotiated for the sale of the Lexave property for a Trans-Lux Motion Picture Theatre. The bonds for *430 the first and second mortgages on the Lexave property were executed by George McCarroll. He was the nominee of Lexave Syndicate, Inc. and was a dummy in whose name title was taken. McCarroll conveyed title to Lexave Syndicate, Inc. subject to the first and second mortgages. The third mortgage was executed by and between the Lexave Syndicate, Inc., mortgagor, and McCarroll, mortgagee, Lexave Syndicate, Inc. did not sign the bonds for which the first and second mortgages were given as security. Neither the first, second nor third mortgages were paid when they matured on July 1, 1936. Shortly after the first mortgage on the Lexave property matured on July 1, 1936, Hyman Schroeder, on behalf of the Syndicate members, including petitioners, commenced negotiations with the Bowery Savings Bank for an eighteen months' extension of the first mortgage. The Syndicate members, including petitioners, offered to pay the sum of $21,000 in cash to the Bowery Savings Bank and individually to guarantee the payment of all real estate taxes during the period of eighteen months if the Bank would grant an extension for eighteen months. In 1936, the real estate market in New York City in the vicinity *431 of the Grand Central district was encouraging, and there was a decided "pick-up" of activity. On December 31, 1936, the liabilities of Lexave Syndicate Inc. were as follows: Mortgages payable
$3,342,500.00
Tenants' security deposits
1,335.00
Real estate taxes payable
7,039.79
Mortgage interest payable
189,845.00
Due Syndicate members for ad-
vances to meet carrying charges
372,890.00
Total
$3,913,609.79
On December 31, 1936, and at all times prior thereto, the capital stock of Lexave Syndicate, Inc. had real and potential value and the respective petitioner's investments therein had not become worthless on or prior to December 31, 1936. On December 31, 1936, none of the petitioners who owned participations in the third mortgage had ascertained such participations to be worthless. On December 31, 1936, none of the petitioners who had made loans to Lexave Syndicate, Inc. had ascertained that the debts owed by Lexave Syndicate, Inc. for such loans had become worthless. Shortly prior to July, 1937, the efforts of the Syndicate members to obtain a satisfactory extension of the first mortgage failed and negotiations therefor were terminated at that time. In August, 1937, *432 the Congress of the United States made an appropriation of the necessary funds to purchase from certain third persons the property at the southwest corner of Lexington Avenue and East 45th Street for a post office site, thus precluding any possibility of the sale by Lexave Syndicate, Inc. of the Lexave property to the United States Government for a post office site. Petitioners learned in August, 1937, of the appropriation of the necessary funds to purchase a site other than the Lexave property and petitioners then concluded that there was no further possibility of selling the Lexave property to the United States Government for a post office site. The real estate market in the City of New York dropped sharply and precipitously in August, 1937. During the fall of 1937 the Lexave Syndicate, Inc. offered to give a deed to the Lexave property to the Bowery Savings Bank without cost to the Bank therefore, but the Bank declined the offer of the deed and informed Lexave Syndicate, Inc. that it deemed it necessary to foreclose and that it intended shortly to foreclose on its first mortgage in order to obtain good title. It did so foreclose in the year 1938 at which time it bid the Lexave *433 property in for $1,000,000. In the month of September, 1937, petitioners and the other Syndicate members decided to make no further payments in order to carry or attempt to sell the Lexave property and to cease all efforts in connection with the Lexave property and concluded at that time to abandon and did at that time abandon their indirect interests in the property. On September 30, 1937, the only asset of Lexave Syndicate, Inc. was the Lexave property which at that time was worth between $2,900,000 and $3,000,000, which was insufficient to pay the first and second mortgages and interest thereon. In September, 1937, petitioners (except Louis W. Abrons) properly concluded and ascertained that their respective participations in the third mortgage were then worthless. In September, 1937, petitioners properly concluded and ascertained that the debts owed to them respectively by Lexave Syndicate, Inc. were then worthless. In September, 1937, the investments of petitioners (except Anne S. Abrons) in the capital stock of Lexave Syndicate, Inc. became worthless. None of the petitioners kept books of account. The petitioners in the respective income tax returns for the calendar year *434 1937 (except as indicated in footnote 2 as to petitioner Fox) deducted and charged off their respective participations in the third mortgage, their respective loans to Lexave Syndicate, Inc. and their respective investments in the capital stock of Lexave Syndicate, Inc. No part of the loans made by the petitioners to Lexave Syndicate, Inc. has been repaid. No part of the participations acquired in the third mortgage by petitioners has been repaid. Lexave Syndicate, Inc. has never declared any dividends. The petitioners have never received any payment for or on account of the amounts invested by them in the capital stock of Lexave Syndicate, Inc. Any part of the stipulation of facts, as corrected (Transcript 47), including the exhibits thereto, not specifically set forth herein is incorporated herein by reference and made a part of these findings of fact. Opinion BLACK, Judge: During the taxable years involved petitioners (except Anne S. Abrons) were stockholders of Lexave Syndicate, Inc. In addition to their investments in the stock of that corporation these petitioners had loaned the corporation certain sums of money. The corporation at the time it was organized purchased the *435 Lexave property from Lexington Central Corporation and gave in part payment therefor a third purchase money mortgage. At that time petitioners (except Louis W. Abrons) were creditors of Lexington Central. Upon receipt of the third mortgage, Lexington Central caused participations therein to be issued to petitioners (except Louis W. Abrons) in part payment of the certificates of indebtedness held by such petitioners for the sums of money they had loaned to Lexington Central. In the taxable year 1937, petitioners ascertained that their respective (1) investments in, (2) loans to, and (3) participations in the third mortgage of Lexave Syndicate, Inc., in the respective amounts set out in our opening statement, were worthless and deducted such amounts in their respective income tax returns for that year. In filing their returns for the year 1938, petitioners duplicated to the extent of 50 percent in certain instances and 100 percent in other instances the deductions taken in 1937 for their respective (1) investments in, (2) loans to, and (3) participations in the third mortgage of Lexave Syndicate, Inc. The respondent disallowed all of the deductions for both years on the principal ground *436 that the worthlessness of such items occurred prior to the year 1937. Petitioners concede that if the claimed deductions for 1937 are allowed in that year, then they are not entitled to deduct any part of the same items in the year 1938. The respondent contends in the alternative that if the worthlessness of these items did not occur in a year prior to the year 1937, then we must find that the worthlessness occurred in 1938; and that in any event the petitioners who owned participations in the third mortgage have failed to prove their statutory "basis" of such participation certificates for bad debt purposes. The determination of when a given stock becomes worthless or when debts are properly ascertained to be worthless are questions of fact. A great deal of evidence was introduced in these proceedings from which we are very definitely convinced that petitioners have proven that the stock of Lexave Syndicate, Inc. did not become worthless until 1937 and that petitioners could not properly have ascertained the debts owing by that corporation to them to be worthless in their entirety in any year prior to 1937. They might possibly have ascertained such debts to have been partially *437 worthless in some prior year, but a taxpayer is not required to ascertain a debt to be partially worthless. He may wait until the debt becomes entirely worthless before charging it off. We have set out in our findings a great many evidentiary facts which will not be repeated here, except to say that in our opinion these evidentiary facts reasonably demonstrate that the Lexave property on December 31, 1936, and at all times prior thereto, had real value in excess of its liabilities; and that the identifiable events which fix worthlessness in a given year did not occur until 1937. One of the strong circumstances in petitioners' favor was the bona fide effort being made from 1932 to August, 1937, by Lexave Syndicate, Inc. and the persons interested therein to sell the Lexave property to the United States Government for use as a post office site at a price of $4,250,000. If that could have been accomplished they would have made a good profit. During the latter part of 1932, it became known that the United States Government was considering the purchase of a post office site just a block away from the Lexave property at a price of $15,000,000. The persons interested in Lexave Syndicate, *438 Inc. thought that this price was too high and that there was a reasonable possibility of breaking up that proposed deal and of selling the Lexave property to the Government instead. A great deal of work was done along that line and it was not until in August, 1937, when the United States Congress finally appropriated a much lesser sum than $15,000,000 for the purchase of the site at the southwest corner of Lexington Avenue and East 45th Street that the persons interested in the Lexave property, including the petitioners herein, realized that all hope of selling the Lexave property to the United States was gone. This was merely one of the identifiable events which we think fixed the worthlessness of the stock and debts in 1937. Other events were the failure in May, 1937, to obtain an extension of the first mortgage; the precipitous decline in general business conditions and the real estate market in New York City in August, 1937; the decline in value during the year 1937 of the Lexave property to a value which was less than the principal amount of the first and second mortgages and past due interest thereon; and the offer in November, 1937, to deed the Lexave property to the first *439 mortgagee without any consideration in lieu of foreclosure on the first mortgage. The respondent in contending that the worthlessness of the stock and debts occurred in a year prior to 1937 relies primarily upon the testimony of a real estate appraiser connected with his department. This witness testified that the fair market value of the Lexave property, exclusive of the leasehold parcel, in July of 1931, was $2,540,000. He stated that he based this valuation in part from "certain sales that had occurred in that locality" but when asked upon cross examination to state the sales he had used, he was unable to produce evidence of a single sale. He made the appraisal of $2,540,000 in December, 1940, which was over nine years after the property was acquired by Lexave Syndicate, Inc. In making the appraisal he admitted he did not take into consideration the fact that this very property was sold on July 2, 1931, for $3,492,500. This was clearly a bona fide sale made in an "arm's length" transaction. Sixty-five percent of the stockholders of Lexave Syndicate, Inc. were persons who had had no interest whatever in the old Lexington Central Corporation. When consideration is given to this *440 actual bona fide sale, to the appraisal made by Horace S. Ely & Company on April 9, 1931, wherein the Lexave property was appraised on that date at $4,000,000, to the fact that in the City of New York in 1931 it was the practice of savings banks to lend on first mortgages no more than 60 percent of the value of the mortgaged property, and to the fact that based upon the Ely & Company appraisal the Bowery Savings Bank just prior to the sale on July 2, 1931, loaned $2,400,000 on the first mortgage on the Lexave property, it is quite apparent that the testimony of the respondent's witness is not at all convincing and does not overcome the preponderance of the evidence in petitioners' favor. The respondent although contending that the worthlessness of the stock and debt occurred in a year prior to 1937 has pointed to no identifiable event that would tend to substantiate his contention. In his brief he says "if it were necessary to show an identifiable event, although it is not so necessary, that event would be in the year 1936 when the maturity date of the mortgages was reached and they were defaulted." This statement fails to take into consideration the facts that there was a decided *441 "pick-up" of real estate activity in New York City in 1936; and that also on December 31, 1936 and until some time in May, 1937, negotiations were being conducted with the Bowery Savings Bank for an extension of the first mortgage wherein the Syndicate members, including petitioners, had offered to pay the sum of $21,000 in cash to the Bowery Savings Bank and individually to guarantee the payment of all real estate taxes during the period of eighteen months if the Bank would grant such an extension. The quoted statement also fails to take into consideration the fact that on December 31, 1936, petitioners reasonably believed that Lexave Syndicate, Inc. might be able to sell the Lexave property to the United States for the sum of $4,250,000. Such a sale would have realized more than sufficient to pay all of the liabilities of Lexave Syndicate, Inc. and also the $175,000 par value of its capital stock. After a careful consideration of the entire record we hold that petitioners (except Anne S. Abrons) are entitled to deduct for the year 1937 under section 23(e) of the Revenue Act of 1936 as "losses sustained during the taxable year and not compensated for by insurance or otherwise" the *442 amounts, as set forth in our opening statement, of their respective investments in the capital stock of Lexave Syndicate, Inc. Cf. Rassieur et ux. v. Commissioner, 129 Fed. (2d) 820. Regarding the loans to Lexave Syndicate, Inc. and the participations in the third mortgage of that company, the applicable statute is section 23(k) of the Revenue Act of 1936, the material provisions of which are in the margin. [4] Section 124, Revenue Act of 1942, which amends section 23(k) of the Internal Revenue Code, is not applicable to these proceedings. It was made applicable by the Revenue Act of 1942, only to taxable years which began after December 31, 1938. Passing for the moment the question of statutory "basis" of the participations in the third mortgage, the petitioners (except Anne S. Abrons) who had made loans to Lexave Syndicate, Inc. and the petitioners (except Louis W. Abrons) who had acquired participations in the third mortgage ascertained these debts of the Lexave Syndicate, Inc. to be worthless in the year 1937. We have found as an ultimate fact that this ascertainment was proper. Cf. Julius M. Rosenthal, et al. v. Helvering, 124 Fed. (2d) 474. *443 The debts were "charged off" with the taxable year 1937 although petitioners did not keep any books, and although petitioner Fox did not deduct the debt of $1,875 in his 1937 income tax return (see footnote 2). Waters F. Burrows, 38 B.T.A. 236. Cf. Rubinkam v. Commissioner, 118 Fed. (2d) 148, 26 A.F.T.R. 653. We hold, therefore, that petitioners (except Anne S. Abrons) are entitled to deduct as bad debts in 1937 the amounts referred to in our opening statement as "(2) payments under guarantees to the first and second mortgagees of properties of Lexave Syndicate, Inc. for the account of Lexave Syndicate, Inc." and that petitioners (except Louis W. Abrons) are entitled to deduct as bad debts in 1937 their statutory basis of the participations in the third mortgage on properties of Lexave Syndicate, Inc. which they acquired in 1931 in part payment of the loans they had previously made to Lexington Central. *444 What is the statutory basis of these participations in the third mortgage? On July 1, 1931, petitioners (except Louis W. Abrons) owned certificates of indebtedness issued by Lexington Central for loans they had previously made to Lexington Central in the respective amounts set out in our findings. When Lexington Central sold the Lexave property to Lexave Syndicate, Inc. on July 2, 1931, and received in part payment a third purchase money mortgage in the amount of $567,500, it caused participations in such mortgage to be issued to petitioners (except Louis W. Abrons) in part payment of the certificates of indebtedness, dollar for dollar, in the respective amounts set out in our findings. Petitioners and respondent agree that the statutory basis of the participations in questions is the "cost" to petitioners of such participations. Section 113 (a), Revenue Act of 1936. They disagree, however, upon what is the cost. The respondent contends that under Forstmann v. Rogers, 128 Fed. (2d) 126, the cost is the fair market value of the portions of the certificates of indebtedness given up by credit for the participations; that there is no evidence in the record *445 as to such values; and that, therefore, petitioners have failed to sustain their burden of proof in this respect. While it is true that where property is given in exchange for other property, the cost of the property acquired is the value of the property given in exchange therefor, it is also true that where there is no evidence as to the fair market value of the property given up in the exchange, in arriving at the value of the property given we may look to the value of the property acquired. Champlin Refining Company v. Commissioner, 123 Fed. (2d) 202. Cf. Countway v. Commissioner, 127 Fed. (2d) 691; Ambassador Petroleum Co., 28 B.T.A. 868, reversed on another point, 81 Fed. (2d) 474. In the instant proceedings the property acquired was the participations in the third mortgage. The mortgage did not bear interest and was to run for five years from July 2, 1931. Back of the mortgage was the Lexave property. The best evidence of the value of the Lexave property on July 2, 1931, is the price for which it was sold on that date. In other words, if Lexave Syndicate, *446 Inc. could have resold the property, say on the following day for the price it paid for it, the third mortgage could have been paid off at par. But since the third mortgage was to run for five years, without interest, we think in determining the fair market value thereof on July 2, 1931, it should be discounted to allow for interest at the legal rate, which under section 370 of the General Business Law of the State of New York was 6 percent. The present value of $1 to be received five years later at 6 percent compound interest is $0.74725817. Accountants' Handbook, E. A. Saliers, p. 138. This factor, multiplied by the face value of the participation certificates received by petitioners (except Louis W. Abrons) represent their statutory cost basis of the participations in the third mortgage and the measure of their deduction under section 23 (k), supra. This is the cost basis of the participations in the third mortgage which we have fixed after considering all the evidence in these proceedings in our findings of fact. The deficiencies for the year 1937 should be recomputed in accordance with this report. The deficiencies for the year 1938 are approved. Decision will be entered *447 under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Hyman Schroeder; Gretchen Melius Herrlich Trust, Louis W. Abrons, Trustee; Samuel M. Fox; Louis W. Abrons; Anne S. Abrons; and Jacob and Sadie Schroeder.↩
2. In his return for 1937 Fox deducted only item (3) in the amount of $2,837.50 which item the respondent disallowed. In his petition for 1937 Fox assigns that disallowance as error and in addition thereto claims as deductible items (1) and (2) in the respective amounts of $875 and $1,875.↩
3. In his return for 1938 Fox claimed a total Lexave deduction of $6,837.50, which the respondent disallowed. In his petition Fox alleges "The deduction of said amount of $6,837.50 on petitioner's return for the year 1938 was erroneous. Said deduction should have been made in the amount of $5,150.00 * * *".↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME In computing net income there shall be allowed as deductions: * * * * *
(k) Bad Debts. - Debts ascertained to be worthless and charged off within the taxable year * * *.↩